**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

CAROLYN DIANNE CHAMBERS,

       Plaintiff,

                                        Case Number: 09-11562

v.

CITY OF DETROIT, a Michigan Municipal                   Paul D. Borman
corporation; DETROIT CITY COUNCIL,            United States District Judge
a Michigan Municipal corporation;
COUNCILWOMAN MARTHA REEVES,
individually and in her official capacity; and
THOMAS STEPHENS, an individual; jointly
and severally,

       Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      This employment matter comes before the Court on defendants City of Detroit, City Council, Martha Reeves, and Thomas Stephens's (collectively "Defendants") Motion for Summary Judgment. (Dkt. No. 39.) Plaintiff, Ms. Carolyn Dianne Chambers ("Plaintiff" or "Chambers"), has filed a response (Dkt. No. 41), and Defendants have filed a reply. (Dkt. No. 46.) Oral arguments were heard on March 10, 2011 at 3:00 p.m. For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART. The Court grants Defendants' motion for summary judgment regarding Plaintiff's state tort claims against the Defendant City of Detroit ("Defendant City") and Defendant City Council ("Defendant Council"), as well as Plaintiff's claims for intentional infliction of emotional distress and hostile work environment. The Court also grants Defendant Reeves summary judgment on Plaintiff's tortious interference claim. The Court, however, denies Defendants' motion in all other respects.

## I.    Background

Ms. Carolyn Dianne Chambers ("Plaintiff" or "Chambers") was an appointee of the Detroit City Council for then-Councilwoman Martha Reeves ("Reeves"). (Defs.' Br. in Supp. of their Mot. for Summ. J. 1.) Chambers worked as Reeves's office manager from January 2006, when Reeves took office, until Chambers resigned on March 6, 2007. (*Id.*; Ex. 2 – Plaintiff's resignation.) Although she was the office manager,[1] the formal title of her position was Administrative Assistant-I. (Ex. 3.) This was Plaintiff's second appointment with City of Detroit, having served years before with the administration of Mayor Dennis Archer as a Neighborhood City Hall Manager. (Defs.' Br. 1.)

Plaintiff's starting salary when she was first hired in Reeves's office was $42,500. (Br. in Supp. of Pl.'s Resp. in Opp. to Defs.' Mot. for Summ. J. 4.) Plaintiff claims that Reeves originally told her that she wanted to pay her more but did not yet have a budget approved for the 2006-07 fiscal year, but promised she would increase her salary once she did. (*Id.* at 3; Ex. 1, Deposition of Carolyn Chambers 19:19-22:17, Apr. 15, 2010.) When her new budget was approved, Reeves increased Plaintiff's pay to $50,000. (Pl.'s Br. 5; Ex. 14.)

There were several other members of Reeves's staff, the most germane of whom were William Ratliff, Defendant Tommy Stephens, Maxine Powell, and Ulysses Council. Ratliff, who

---

[1] There is some dispute as to Plaintiff's actual role. Defendants claim that "Plaintiff alleges that she held a position of "Office Manager" on Reeves's staff" (Defs.' Br. 3.) Reeves testified that she thought she hired her to be her secretary. (Pl.'s Br. Ex. 6, Dep. of Martha Reeves, 91:13-15, Apr. 27, 2010.) Plaintiff's official title was Administrative Assistant-I, however Reeves testified that "[s]he wasn't hired to be an administrative assistant." (*Id.* at 78:22.) The HR form that Reeves signed to appoint Plaintiff read "This is to certify that Carolyn Diane Chambers is appointed to the salaried position of Office Manager (Administrative Assistant) 42,500 annually with benefits." (Ex. 9.) Finally, on Reeves's letterhead, which listed her staff, Plaintiff was identified as office manager. (Reeves Dep. 110:13-18.)

is Caucasian, was Reeves's Chief of Staff.  Ratliff and Plaintiff were both appointees.  (Ex. 14.)
Stephens and Council were both contract employees,  paid by the hour for the time worked, and did
not receive benefits such as paid vacation or sick time.  Stephens was a legislative aide who
originally made $25.00 an hour, which translated into $52,000 a year, without benefits, if he worked
a forty-hour week.  (Ex. 14.)  Council originally was paid $20.00 an hour, or $41,600 a year.  (*Id.*)
Powell made $16.83 an hour, or $13,127 because she only worked on Tuesdays and Thursdays.  (*Id.*)

The parties' accounts of the duties of the various employees, and the work they did on a day
to day basis, are wildly different.  Plaintiff claims that Mr. Council was nothing more than Reeves's
driver, who did nothing when he was waiting in the office to take her places except play games and
watch movies (including porno at times) on his computer.  (Pl.'s Br. 6.)  Plaintiff alleges that
Stephens's role was "not entirely clear."  (*Id.* at 4.)  She claims he would routinely arrive late and
eat breakfast at his desk, was known to take three to four hour "lunches" to conduct personal
business related to the bar he owned and operated, and would at times lie about his whereabouts.
(*Id.* at 4-5.)  Plaintiff claims that Powell, who is in her nineties, would come in on Tuesdays and
Thursdays primarily to go to lunch and water the office's plants.  (*Id.* at 7 n.7; Ex. 5, Deposition of
William J. Ratliff 25:22-26:12, June 10, 2010.)

Plaintiff alleges that despite the fact that Council and Stephens were contract employees,
their time sheets, which were approved by Reeves, always reported that they had worked a forty
hour week regardless of how much they actually worked or if they were out sick or on vacation.
(Pl.'s Br. 5.)  When Plaintiff found out about this practice, she confronted Stephens about it.  (*Id.*)
Plaintiff claims he told her that he got paid eight hours a day regardless of the amount of time he
actually worked.  (*Id.*)  Plaintiff tried to curb this practice by instituting a sign-in/sign-out policy for

contract workers.  (*Id.* at 5.)  Stephens and Council both refused to participate, and when Plaintiff or Ratliff would raise the issue of only paying contract workers for the time they actually worked with Reeves, she consistently told them that they should not worry about it and saying "[i]t's my office, I can pay whoever I want what I want." (Chambers Dep. at 76:22-24.)

This suit centers around an altercation between Plaintiff and Defendant Stephens regarding his time for one pay period in the beginning of March 2007 (the "March incident").  Although Ratliff usually filled out the time sheets for the contract workers, he was on vacation, and therefore Plaintiff was required to do them.  (Chambers Dep. at 56:5-13.)  Plaintiff testified that when she filled them out she refused to give Stephens credit for three days he was out sick.  (*Id.* at  57:22-23.) She claimed she knew he was out sick those days because Stephens called up the office to say he was not feeling well and she was the one who answered that phone call.  (*Id.* at 57:16-19.)  When Stephens returned to work the next week, Plaintiff claims that he came up to her and said "you better have paid me for those days I was home." (*Id.* at 58:5-8.)  Plaintiff told Stephens that she already submitted the time and that he would have to talk to Reeves if he wanted her to change it. Apparently after going back and forth a bit over whether Plaintiff could change what she originally recorded, Stephens said "you're going to pay, bitch." (*Id.* at 62:4-10.)

When Stephens found out that he did not get paid, Plaintiff alleges he came in screaming at her, "[y]ou white racist.  You and [Ratliff] are white racists.  You crackers.  I'm going to have your job, both of your jobs before this is over.  You should have paid me.  You're going to pay." (*Id.* at 66:18-24.)  After the incident, Plaintiff claims she went to complain to Reeves about it, but Reeves did not want to talk about it.  (*Id.* at 88:24-89:1.)

The next day, Plaintiff and Ratliff both received letters indicating that their salaries had been

4

reduced.  (Ex. 11.)   Plaintiff's pay was slashed by $20,000, or forty percent, from $50,000 to $30,000.  (*Id.*)  In the letter Reeves put forth several reasons for why Plaintiff's pay was cut.  She claimed that the average Office Manager made $25,000-30,000, that she believed Plaintiff was "overly qualified," and that there were purchase orders for questionable or missing items.  (*Id.*)  At her deposition, however, Reeves claimed the reduction occurred because Plaintiff's salary was outside of the White Book range and because of budgetary concerns.  The record clearly demonstrates, however, that Plaintiff's salary was within the range of salaries for an Administrative Assistant-I set forth in the White Book, which was $27,600-$59,900.  (Pl.'s Br. Ex. 7, Deposition of Deborah Richardson 21:24-22:2, Apr. 19, 2010.)  In fact, HR wrote the White Book range on the form used to process Plaintiff's raise.  (Ex. 14.)

After getting the letter, Plaintiff claims she went to speak with Reeves about it but, again, Reeves did not want to discuss the matter, and told Plaintiff [i]t's my final decision.  I'm not discussing it."  (Chambers Dep. 131:18-20.)  Both Ratliff and Plaintiff resigned that day.  During their last day, Stephens made several comments to Ratliff and Plaintiff.  Allegedly, Stephens said "I told you if I didn't get paid, there was going to be some problems, and no white people are going to decide whether I get paid or not."  (Ratliff Dep. 37:1-6.)

In addition to the March incident, Plaintiff's disparate treatment claim focuses on another altercation between Plaintiff and Stephens in October 2006 (the "October 2006 incident").  Plaintiff claims that Stephens made it known that he did not think that Ratliff and Plaintiff, who are both white, should be representing a black Councilwoman in the community.  (Chambers Dep. 96:9-22.)  During the October 2006 incident, Plaintiff contends that Stephens said "[y]ou f-ing white people shouldn't be running an office for a black Councilwoman" and "[y]ou shouldn't be out in the

community, you crackers, for representing her.  It should only be black people in this office representing a black Councilwoman." (*Id.*)

On December 27, 2007, Plaintiff filed a complaint against Defendants with the EEOC alleging race discrimination and retaliation for complaining about being subjected to racial discrimination.  (Pl.'s Br. Ex. 16.)  Plaintiff confined her complaint to events occurring between March 2 and March 6, 2007.  (*Id.*)

## II.   Standard of Review

Summary judgment is only appropriate if there are no genuine issues of material facts and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 487 (6th Cir. 2006).  When applying this standard, courts must view all materials, including all of the pleadings, in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the responsibility of establishing no issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets its burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial.  *Id.* at 324.  The non-moving party must do more than show that there is some abstract doubt as to the material facts.  It must present significant probative evidence the issue exists in order to defeat a motion for summary judgment.  *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

6

## III.    Discussion

### A.    Disparate Treatment/Racial Discrimination

Plaintiff alleges that Defendants discriminated against her and treated her differently than other employees because she is white.  Plaintiff has brought claims under 18 U.S.C. § 1981, which prohibits treating people differently under contracts based on race; § 1983 for violation of her right to equal protection; and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA").  Courts use the same burden-shifting analysis the United States Supreme Court articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to analyze claims brought pursuant to ELCRA, and section 1981. *See, e.g.*, *Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 824 (E.D. Mich. 2009); *see also Hazle v. Ford Motor Co.*, 456 Mich. 456, 462 (2001) (applying *McDonnell Douglas* to discrimination claim under ELCRA).  Courts also employ the *McDonnell Douglas* framework to decide equal protection claims brought pursuant to 18 U.S.C. § 1983.  *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 566-67 (6th Cir. 2004).   Finally, this is also the same test used to evaluate claims stemming from Title VII of the federal Civil Rights Act.  *Curry*, 669 F. Supp. 2d at 824.  Accordingly, all of Plaintiff's claims for unequal treatment will be analyzed in this section.

The ultimate question in every case alleging disparate treatment on the basis of race is "whether the plaintiff was the victim of intentional discrimination."   *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)).   To establish intentional discrimination, the plaintiff must demonstrate direct evidence of discrimination or present sufficient circumstantial evidence to allow an inference of discrimination. *Id.* (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003)).

Direct evidence does not require the jury to draw any inferences to determine that the adverse

employment action was motivated, at least in part, by racial prejudice. *Id.* at 825 (quoting *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007)). "Evidence of discrimination is not considered direct evidence unless [an improper] motivation is explicitly expressed." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006). Here, Plaintiff has not presented any direct evidence of discrimination on the part of Reeves, Defendant City, or Defendant Council.

Even without direct evidence though, Plaintiff can still prevail if she can establish an inferential case of discrimination under *McDonnell Douglas*. *Curry*, 669 F. Supp. 2d at 824-25. Under *McDonnell Douglas*, which was clarified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), the plaintiff must first prove a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252-53; *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 342 (6th Cir. 1998). If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse action. *Burdine*, 450 U.S. at 252-53 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant is able to articulate a legitimate reason, the burden then shifts back to the plaintiff who must prove the given explanation was merely a pretext. *Id.* at 256.

## 1.     The *Prima Facie* Case

A plaintiff establishes a *prima facie* case of discrimination by demonstrating that "(1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was . . . treated differently than similarly situation non-protected employees." *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (internal citations and quotation marks omitted). In order to satisfy the first prong in a "reverse discrimination" case, the plaintiff must show "background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against the majority." *Gardner v.*

*Wayne County*, 520 F. Supp. 2d 858, 865 (E.D. Mich. 2007) (quoting *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002)).  In *Gardner*, the court held the plaintiff demonstrated sufficient background circumstances by showing she was a Caucasian employee in an office that was predominantly staffed and managed by African-Americans.  *Id.* at 865-66 (quoting *Weberg v. Franks*, 229 F.3d 514, 523 (6th Cir. 2000)).

An adverse employment action is anything that "constitutes a significant change in employment status," and can encompass claims for failing to hire, fire, or promote, reassignment to a position with significantly different responsibilities, or a drastic change in benefits.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 403 (6th Cir. 2008) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).  However, "petty slights, minor annoyances, and simple lack of good manners" cannot constitute an adverse action.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  A significant decrease in salary can constitute an adverse employment action.  *Wilcoxon v. Minn. Mining & Mfg. Co.*, 235 Mich. App. 347, 363 (1999) (citing  *Kocsis v. Multi-Care Mgt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)).

To satisfy the similarly-situated prong, the plaintiff must prove that the comparable employees are similar in all *relevant* aspects.  *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)) (emphasis in original).  Similarly situated employees generally have to have dealt with the same supervisor and been subject to the same standards.  *Curry*, 669 F. Supp. 2d at 826 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  However, an employer may choose to treat different rule violations more or less severely without the employees necessarily being similarly situated.  *See Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 503 (6th Cir. 2009).

9

In *Ladd*, the Sixth Circuit emphasized that the purpose of looking at similarly situated employees is to discern whether the employer/supervisor was motivated by prejudice, not to question their business judgment. *Id.*

The Court finds that Plaintiff has established a *prima facie* case. First, the protected group prong is satisfied because Plaintiff is alleging reverse racial discrimination and works in an office that is staffed by a majority of African-American employees and is managed by Defendant Reeves, who is African-American. *See Gardner*, 530 F. Supp. 2d at 865-66. Second, it is clear that she suffered an adverse employment action. Her pay was cut $20,000 (40% of her salary) for reasons allegedly unconnected to poor work performance. Accordingly, the adverse action requirement is met. *See Wilcoxon*, 235 Mich. App. at 363. Defendants also do not contend that Plaintiff is unqualified for the position. In fact, Reeves testified that Chambers was good at her job and did "excellent" work. (Reeves Dep. 63:11-12; 119:2.)

The only criterion that is in dispute is whether Plaintiff was treated differently than similarly situated employees that were not members of the same protected group. (Defs.' Br. 6.) Defendants claim that Plaintiff was not similarly situated to the other Administrative Assistants because she made much more than them. (*Id.*) Defendants claim that Rashida Moore made $30,000 a year, Taranta Gatson-White made $38,000 annually, and Jillian Hearn had a salary of $40,000. (*Id.* at 2; Ex. 10.) Accordingly, Plaintiff's pay cut merely put her in line with other Administrative Assistants. Defendants also claim that Hearn and Gatson-White are Caucasian. (Defs.' Br. 2.) There is, at best, some confusion over this last point. In Reeves's deposition, she testified that, aside from Plaintiff and Ratliff, she did not have any other white employees and has not had any since Plaintiff and Ratliff resigned. (Reeves Dep. at 124:8-13.) But Plaintiff testified that she thought Hearn was

Mexican or Caucasian and that Taranta White was also Caucasian. (Chambers Dep. 42:21-43:7.)

Plaintiff on the other hand argues that she was treated differently than other similarly situated employees because purportedly her pay was reduced due to budgetary concerns but the only two people who received pay cuts were the only two white employees – Plaintiff and Ratliff. (Pl.'s Br. 16-17.) Plaintiff also argues that the salary comparisons are unhelpful because as Office Manager she supervised Hearn and Gatson-White. (*Id.* at 17.) At the very least, when viewed in the light most favorable to the Plaintiff, a genuine issue of material fact exists as to whether Plaintiff was treated differently than similarly situated employees who were not part of her protected group. Accordingly, the Court holds that Plaintiff has made out a *prima facie* case.

### 2.      Legitimate, Non-Discriminatory Reason

Once the plaintiff presents sufficient evidence to make out a *prima facie* case, the burden shifts to the defendants to state a "legitimate, nondiscriminatory reason" for the adverse action. *Burdine*, 450 U.S. at 252-53 (quoting *McDonnell Douglas*, 411 U.S. at 802). Defendants claim Plaintiff and Ratliff's salaries were reduced "due to budgetary concerns," and because they were both "overpaid" in Reeves's estimation. (Defs.' Br. 5.) Defendants claim that Reeves was faced with a budget shortfall and decided that decreasing Plaintiff and Ratliff's pay by twenty thousand dollars each was the best way to handle it. This satisfies Defendants' obligation to articulate a "legitimate, nondiscriminatory reason" for the pay decease.

### 3.      Pretext

Despite Defendants' non-discriminatory stated reason for reducing Plaintiff's pay, Plaintiff can still successful recover on her disparate treatment claim if she can demonstrate that the alleged budgetary concerns were merely a pretext. *Burdine*, 450 U.S. at 256. Generally, pretext can be

11

shown by evidence that: (1) the proffered reason has no basis in fact; (2) the articulated explanation did not actually motivate the adverse action; or (3) the stated reason was insufficient to motivate the action. *Curry*, 669 F. Supp. 2d at 828 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). The plaintiff will not meet this burden by simply demonstrating that the stated reason was pretextual. Rather, the employee must prove that it was a pretext for unlawful discrimination. *Hazle*, 464 Mich. at 465-66. To avoid summary judgment, the plaintiff only needs to establish a genuine issue of material fact as to whether the employer's proffered reason was a pretext. *Hazle*, 464 Mich. at 465 n.10.

Plaintiff has established that a genuine issue of material fact exists as to whether the budgetary shortfall Defendants cite as the reason for the pay cuts has any basis in fact. Ratliff, who helped Reeves manage her budget and reviewed the monthly reports she received, testified that he never saw or heard of anything that would indicate Reeves was experiencing, or coming close to incurring, a budget shortfall. (Ratliff Dep. 71:8-17.) Plaintiff corroborated that Ratliff handled the office budget. (Chambers Dep. 51:7-14.) Most significantly, during Reeves's deposition the following exchange occurred:

> Q: Did you ever, during the time you were on the council, did you ever receive notification from the administration as to your budget, where you were with regard to the amount of money allocated to you and the like?
>
> A: Not at any occasion.
>
> Q: Okay. So nobody would ever say to you, for example, Ms. Reeves, your budget is X, you've spent Y, here's where you are on your budget, nothing like that?
>
> A: Deborah Richardson would give me reports periodically I guess every fiscal session, and she would tell me what my expenditures were, what my budget was, how much money was allocated and how much was remaining.
>
> Q: She did that with everybody, I assume?
>
> A: Yes.

> Q:  Just to keep you up to date?
> A:  Yes.
> Q:  I assume **she never told you you were ever having any problems?**
> A:  **No.**

(Reeves Dep. 87:23-88:17 (emphasis added).)  Also, her 2006/07 Allocation Report showed Reeves had a remaining budget of $75,767 after accounting for her staff's salaries.  (Pl.'s Br. Ex. 10.) Taken together, these testimonials demonstrate that there is a genuine issue of material fact as to whether the budgetary concerns Defendants claim caused the salary cuts had any basis in fact.

Plaintiff has also demonstrated that a genuine issue of material fact exists regarding whether the budgetary concerns, even if true, were the real reason why Reeves decreased Plaintiff's salary. Defendants claim that comparatively Plaintiff's salary for an Administrative Assistant-I was way higher than everyone else's. (Defs.' Br. 1.) However, just four days after Reeves lowered Plaintiff's pay by $20,000 due to "budgetary concerns," she elevated Stephens from a contract employee to an appointee and increased his pay to $52,000 annually with benefits.  (Ex. 15.)  When asked why Defendant Stephens's salary was increased, Reeves testified "different positions, different titles." (Reeves Dep. 75:3-12.)   In fact, Stephens and Chambers both held the position/title of Administrative Assistant-I.  In addition to raising Stephens's pay, Reeves also gave Council a raise in April 2007 to $42,000 a year.  In her deposition when asked why she thought Council deserved a raise after Plaintiff's pay had recently been cut to $30,000 because of budget issues, Reeves stated "I didn't compare salaries of each individual employee," and explained "I paid him what I felt I wanted to pay him."  (*Id.* at 77:4-15.)  This contradicts Defendants' argument that Plaintiff's pay cut was justified because her salary was *comparatively* higher than other Administrative Assistants.

At her deposition, Reeves testified many times that she reduced Plaintiff's salary because

it was out of the range for an Administrative Assistant-I based on the White Book. (Reeves Dep. 16:18-19; 67:16-17; 72:6-21.) It is clear, however, that Plaintiff's salary was always within the White Book's range. (Defs.' Br. Ex. 4.) Reeves eventually admitted as much in her deposition. (Reeves Dep. 71:13-72:3.)

Furthermore, Defendants' claim that Plaintiff's pay was cut because Reeves did not know what she was making and thought that it was way out of line with her position is belied by the fact that Reeves allegedly told Chambers that she could only offer her $42,500 when she was first hired but would give her a raise to pay her what she was worth when she got her budget approved (which she did). (Pl.'s Br. 3; Chambers Dep. 19:19-22:17.)

The evidence described above clearly raises a genuine issue of material fact as to whether concerns about the budget were merely a pretext for lowering Plaintiff's pay. Plaintiff must also establish, however, that it was a pretext for a discriminatory motive. *See Hazle*, 464 Mich. at 465-66. At this time, the Court holds that Plaintiff has put forth sufficient facts to create a genuine issue of material fact on this issue.

Plaintiff has alleged that she was the victim of multiple instances of racial discrimination. In 2006, Plaintiff alleges that Stephens went around the office saying Ratliff and Chambers should not be going to community events because they were white and should not be representing a black Councilwoman. (Chambers Dep. 96:9-22.) Allegedly, Stephens said "[y]ou f-ing white people shouldn't be running an office for a black Councilwoman" and "[y]ou shouldn't be out in the community, you crackers, for representing her. It should only be black people in this office representing a black Councilwoman." (*Id.*) Plaintiff did not fill out a formal EEOC complaint at the time, but complained to Ratliff. (*Id.* at 97:17-21.) Ratliff also testified that Stephens repeatedly

14

told him a "white boy" should not be representing Reeves in the community and often referred to him as a "white boy."  (Ratliff Dep. 36:10-21.)

Plaintiff further claims that after Stephens learned that he did not receive pay for the days he was out, he came in screaming "I'm going to have your job and Bill's job.  You are both white racists.  You're crackers." (Chambers Dep. 89:10-12.)  This testimony was corroborated by Ratliff.  (Ratliff Dep. 68:1-13.)  Ratliff testified that on the last day of his employment, after he and Plaintiff discovered their pay had been dramatically reduced, Stephens told him "I told you if I didn't get paid, there was going to be some problems, and no white people are going to decide whether I get paid or not," and that he was going to have Ratliff's job.  (*Id.* at 37:1-6.)  Ratliff also stated that same day he overheard a conversation between Stephens and Chambers during which Stephens told Plaintiff "I told you this is how it would end up . . . .  No crackers are running this ship."  (*Id.* at 40:1-4.)

While these events focus exclusively on Defendant Stephens, Plaintiff alleges that Reeves was aware of these incidents and tolerated such discrimination.  She also contends that it was the true motivation behind her pay cut.  Plaintiff has demonstrated that a genuine issue of material fact exists regarding whether Reeves was aware of the discrimination complained of, tolerated it, and whether it ultimately motivated her decision to lower Plaintiff and Ratliff's pay.

First, regarding the incident in 2006, Plaintiff admitted that she never spoke to Reeves about Stephens's comments.  (Chambers Dep. 117:9-11.)  But, Ratliff told her that he talked to Reeves about it.  (*Id.* at 115:10-13.)  He told Plaintiff that when he brought it up to Reeves she said "I can't do anything with Tommy.  Leave him alone."  (*Id.* at 115:1-6.)

When Stephens would yell at Plaintiff about not having to sign-in Chambers testified that

15

she complained to Ratliff who spoke to Reeves about it. (*Id.* at 74:16-21.) Chambers stated that she talked to Reeves about paying Stephens when he was on vacation. (*Id.* at 76:19-21.) She claims she brought up the inaccurate recording of time for both Stephens and Council with Reeves many times. (*Id.* at 166:2.) When she told Reeves that she should not be paying them for time they did not work, Reeves told her "[i]t's my office, I can pay whoever I want what I want." (*Id.* at 76:22-24.)

After the incident in March, Plaintiff claims that she tried to talk to Reeves about it. (*Id.* at 88:24-89:1.) She testified "I mean, I went to try and talk to Martha Reeves and tell her what he was saying, and she didn't want to hear it. She didn't want to discuss it." (*Id.*) She also stated that she tried to talk to Reeves after receiving the memo about her salary being reduced, but Reeves told her "[i]t's my final decision. I'm not discussing it." (*Id.* at 131:18-20.)

Defendants are right to point out that Plaintiff admits she does not know whether Stephens talked with Reeves after the incident (Chambers Dep. 65:5-7; 66:13-15) and that she was just speculating that he spoke to her about it. (*Id.* at 111:19-21.) Although Defendants deny that Reeves and Stephens discussed the March incident, a genuine issue of material fact exists as to whether Stephens and Reeves talked about it. Ratliff testified that Stephens exerted a considerable amount of influence over Reeves, stating he had more input than even Ratliff did as Chief of Staff. (Ratliff Dep. 44:2-8.) On Monday, after discovering he had not been paid for days he was out sick, Stephens allegedly came in the office screaming "I'm going to have your job and Bill's job. You are both white racists. You're crackers." (Chambers Dep. 89:10-12.) Then, the next day Reeves decided to cut Plaintiff and Ratliff's pay. Finally, the two people Reeves hired to replace Plaintiff and Ratliff were both African American. This too suggests that race was a motivating factor. *See Gardner*, 520 F. Supp. 2d at 865 (holding that showing the plaintiff was replaced by someone outside of her

protected class could satisfy the similarly situated prong). Accordingly, the Court holds that Plaintiff has demonstrated a genuine issue of material fact exists regarding whether Defendants' proffered explanation for why Plaintiff's pay was cut was a pretext for unlawful discrimination. As a result, the Court DENIES Defendants' motion for summary judgment regarding Plaintiff's disparate treatment claims.

### B.    Retaliation

The ELCRA and Title VII prohibit retaliation against an employee for complaining about discrimination. *Curry*, 669 F. Supp. 2d at 831; *see also* Mich. Comp. Laws § 37.2701. In order to make out a *prima facie* case for retaliation, the plaintiff must demonstrate that: (1) she engaged in protected activity; (2) the defendant was aware the plaintiff engaged in that activity; (3) the defendant took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices is protected conduct. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 551, 578 (6th Cir. 2000)) (quotation marks omitted). Where an adverse action occurs shortly after protected activity, the close temporal connection raises an inference that satisfies the causal connection for purposes of making out a *prima facie* case. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525-26 (6th Cir. 2008); *Smith v. City of Salem*, 378 F.3d 566, 571 (6th Cir. 2004). If the plaintiff establishes a *prima facie* case for retaliation, the analysis follows the same burden-shifting framework as disparate treatment claims. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008).

17

Plaintiff claims that Defendants unlawfully retaliated against her for complaining about the racial discrimination she was receiving from Defendant Stephens. (Compl. ¶ 102.) The Court holds that Plaintiff has successfully made out a *prima facie* case for retaliation under ELCRA. First, Plaintiff alleges that after the March incident she went in to complain to Reeves. (Chambers Dep. 88:24-89:1.) This satisfies the first prong because her complaint is protected activity. The second requirement is met because it demonstrates that Reeves had notice of her complaint. The third criterion is also clearly satisfied. As stated above, a forty percent decrease in pay is an adverse employment action. Finally, Plaintiff has satisfied the causation requirement because of the close temporal connection between her protected activity and the adverse action raises an inference that satisfies this prong for purposes of making out the *prima facie* case. *See Mickey*, 516 F.3d at 525-26. The incident occurred on a Monday and Plaintiff testified she went in to complain to Reeves about Stephens's comments that day. The next day Plaintiff's wages were reduced by $20,000.

Once Plaintiff establishes a *prima facie* case, the same *McDonnell Douglas* burden-shifting framework is employed. Because the analysis mirrors Plaintiff's disparate treatment claim, it is unnecessary to reiterate those steps here. The Court DENIES Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim for the same reasons it denies their motion regarding Plaintiff's disparate treatment allegations.

### C.    Hostile Work Environment

Establishing a claim for hostile work environment is the same under Michigan law as it is under Title VII. *Curry*, 669 F. Supp. 2d at 833 (citing *Quinto v. Cross & Peters Co.*, 451 Mich. 358, 368-69 (1996)). To prove a claim for hostile work environment under Title VII, the plaintiff must show: (1) she belongs to a protected group; (2) she was subject to harassment; (3) that was based

18

on her protected status; (4) that affected a term, condition, or privilege of employment; and (5) the defendants knew, or should have known, about the harassment and did not take appropriate action. *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999).

This test includes both an objective and subjective component. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). The conduct must be so severe or pervasive such that it creates a hostile environment both to the reasonable person and the victim. *Id.* The court must consider the "totality of the circumstances" when analyzing whether the harassment was sufficiently pervasive or severe. *Id.*; *see also Williams v. Gen. Motors Corp.*, 187 F.3d 553, 561 (6th Cir. 1999).

The very nature of hostile environment claims implies repeated conduct. *Curry*, 669 F. Supp. 2d at 832 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). Although incidents might seem isolated over an extended period of time, "[t]he Sixth Circuit has cautioned against separating such incidents and evaluating them individually, since that practice tends to ignore the totality of the circumstances, which must be considered, and 'robs the incidents of their cumulative effect.'" *Id.* at 834 (quoting *Williams*, 187 F.3d at 561).

Conduct that creates a hostile work environment does not need to be focused specifically at the plaintiff. *Ladd*, 552 F.3d at 500. The plaintiff does not need to be present either, she can learn about it after the fact. *Id.* Although it is not necessary to prove physical or serious psychological injury, "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)) (quotation marks omitted). "Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work

19

environment is quintessentially a question of fact." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)) (quotation marks omitted).

Although often the question of whether the degree or severity of conduct constitutes a hostile work environment is a question of fact, the Court grants Defendants' motion for summary judgment as to Plaintiff's hostile work environment claim. Plaintiff is unable to demonstrate that whatever harassment she was subjected to affected a term, condition, or privilege of her employment. In her deposition, Plaintiff admitted that the comments Stephens made to her in October 2006, indicating that he did not think a black Councilwoman should be represented by white people, did not affect her ability to work. (Chambers Dep. 101:1-22.) Plaintiff testified "I was very careful and guarded with [Stephens], but no, it didn't affect my work." (*Id.* at 101:7-8.) Later she confirmed that she did not miss any work or receive counseling due to any type of harassment, and that she was "able to manage the office and do everything [she] had been doing prior to him making those statements in October 2006." (*Id.* at 101:18-102:14.)

Also telling is the fact that when Plaintiff filed a complaint with the EEOC for racial discrimination, she was required to identify when the harassment or discrimination had occurred. (Pl.'s Br. Ex. 16.) On the form, Plaintiff identified March 2, 2011 as the earliest date that the discrimination occurred and March 6, 2011 (her last day on the job) as the latest date. (*Id.*) While this is not necessarily dispositive, it indicates that Plaintiff did not perceive her work environment as hostile enough throughout her employment to merit including it in her complaint.

Because Plaintiff's own testimony demonstrates that she is unable to demonstrate that the harassment she received affected a term or condition of her employment, the Court GRANTS

Defendants' motion for summary judgment with respect to Plaintiff's hostile work environment claim.

### D.   Governmental Immunity

In addition to her claims under the ELCRA and 18 U.S.C. §§ 1981 and 1983, Plaintiff alleges Defendants also committed several state common law torts.  Plaintiff contends all Defendants wrongfully terminated her employment in violation of public policy.  Plaintiff also argues that Defendants Reeves and Stephens are guilty of tortious interference with an advantageous business relationship, civil conspiracy, and intentional infliction of emotional distress.  Defendants claim that Defendants City and Council are immune from tort actions under the Government Tort Liability Act ("GTLA"), Mich. Comp. Laws § 691.1407 ("Section 7").  They also argue that "[g]overnmental immunity extends to governmental employees absent gross negligence."  (Defs.' Br. 13 (quotation marks omitted).)  Because Section 7 differentiates between immunity for government agencies and individual officers, employees, or members, immunity for Defendants City and Council will be analyzed separately from that of Defendants Reeves and Stephens.  *See* § 1407(1), (2).

### 1.   Defendants City and Council

In the GTLA, the Legislature clearly stated, "[e]xcept as otherwise provided in this act, a governmental agency is immune from tort liability if [it] is engaged in the exercise or discharge of a governmental function." *Mack v. City of Detroit*, 467 Mich. 186, 195 (2002) (quoting §1407(1)). As a result, an agency is immune unless the GTLA specifically permits a civil suit by citizens. *Id.* In *Mack*, the Michigan Supreme Court identified five exceptions to governmental immunity for an agency. *Id.* at 195 n.8. They are the "highway exception," Mich. Comp. Laws § 691.1405; the "motor vehicle exception," § 1405; the "public building exception," § 1406; the "proprietary function

21

exception," § 1413; and the "governmental hospital exception," § 1407(4). *Id.* The Legislature has also codified one other exception, the "sewage disposal system event exception." (Defs.' Br. 14 (citing § 1416).)

The plaintiff must plead facts in avoidance of governmental immunity. *Mack*, 467 Mich. at 204. Plaintiffs can accomplish this "by stating a claim that fits within a statutory exception or by pleading facts that demonstrate that the alleged tort occurred during the exercise or discharge of a non-governmental or proprietary function. *Id.* A "governmental function" is anything that is expressly or implicitly authorized by state law. *Id.* (quoting Mich. Comp. Laws § 691.1401(f)). In *Mack*, the court held that the management and operation of a police department was a well-established government function. *Id.*

Outside of the GTLA, however, there are specific actions against the government which may go forward. *Mack*, 467 Mich. at 195. Enforcement of the Civil Rights Act is one such example. *Id.* at 195 n.9 (citing Mich. Comp. Laws §§ 37.2104(g), 37.2202(a); *Manning v. Hazel Park*, 202 Mich. App. 685, 699 (1993)). As a result, the agency Defendants are not immune from Plaintiff's retaliation, discrimination, or hostile work environment claims. With respect to the state common law tort claim for wrongful termination in violation of public policy, however, the Court holds that Defendants City and Council are immune under Section 7(1). Plaintiff has not identified any statutory exception her claims fall under or alleged that the conduct at issue occurred in furtherance of a non-governmental function. Accordingly, Defendants' motion for summary judgment is GRANTED regarding Plaintiff's claim for wrongful termination in violation of public policy with respect to Defendants City and Council.

**2.      Defendants Reeves and Stephens**

22

The Michigan Supreme Court articulated the test for determining whether an individual defendant is entitled to governmental immunity under Michigan state law in *Odom v. Wayne County*, 482 Mich. 459 (2008).  The *Odom* court clarified the intersection between Section 7 and *Ross v. Consumers Power Co. (On Rehearing)*, 420 Mich. 567 (1984).  *Odom*, 482 Mich. at 467-68.  In 1984, *Ross* comprehensively described the common-law test for individual governmental immunity for all tort actions.  *Id.* at 468.  The court held that judges, legislators, and the highest executive officials of all levels of government were immune from all tort liability when acting within the scope fo their governmental authority.  *Ross*, 420 Mich. at 633.  Lower-level officials were immune under the theory of qualified immunity if: their acts were taken during the course of employment and within the scope of that employment; they were taken in good faith; and they were discretionary/decisional, but not ministerial/operational.  *Id.* at 633-34.

In 1986, the Michigan State Legislature amended the GTLA in response to *Ross*.  *Odom*, 482 Mich. at 468.  The current version of Section 7(2) affords individual immunity to government officials "without regard to the discretionary or ministerial nature of the conduct in question," when the officer's actions were in the course of employment and (a) the employee "reasonably believes he or she is acting within the scope of his or her authority;" (b) while discharging a governmental function; and (c) the conduct does not amount to gross negligence.  *Id.* at 468-69.  The Legislature also codified the absolute immunity the *Ross* court bestowed upon high-ranking officials.  § 1407(5).

Section 7(3), however, states that "[s]ubsection (2) does not alter the law of intentional torts as it existed before July 7, 1986."  The *Odom* court held that the Legislature intended for the common law, as articulated by the Michigan Supreme Court in *Ross*, to govern individual officer immunity for intentional torts.  482 Mich. at 470-71.  After discussing *Ross* at length, the *Odom*

23

court distilled the body of law governing governmental immunity for individual officers down to the following principles.

When determining whether an individual government employee is entitled to governmental immunity, the court must first, determine whether the individual is shielded by absolute immunity. *Id.* at 479. Under section 1407(5), the defendant is entitled to absolute immunity if he/she is a judge, legislator, or the highest-ranking appointed executive official at any level of government. The burden is on the plaintiff to establish a statutorily created exception to absolute sovereign immunity. *Id.* at 478-49. This is because sovereign immunity protects the state from the expense of having to contest allegations as well as from liability generally. *Id.* at 478.

If absolute immunity is inappropriate, the court must next ask whether the plaintiff alleges an intentional or negligent tort. *Id.* at 479. If it is a negligent tort, the court determines if the officer caused the injury while acting in the course of employment and reasonably believed he was acting within the scope of his authority, while engaged in an exercise of a government function, and in good faith. *Id.* at 479-80.

If the plaintiff alleges an intentional tort, the court must determine whether the defendant established that he is entitled to individual immunity under the *Ross* test. *Id.* at 480. The defendant must prove: (a) the acts were undertaken during the course of and within the scope of his employment; (b) in good faith, without malice; and (c) the acts were discretionary. An act is discretionary if it involves personal deliberation, decision-making, and judgment. *Id.* at 476 (quoting *Ross*, 420 Mich. at 634). Bad faith is defined by malicious intent, or willful and corrupt misconduct. *Id.* at 474. Although the burden rests with the plaintiff to overcome absolute sovereign immunity, "the Legislature has not abrogated the common law by shifting the burden of proof with

24

regard to governmental immunity for individuals.  Accordingly, the burden continues to fall on the governmental employee to raise and prove his entitlement to immunity as an affirmative defense." *Id.* at 479.

All of the state common law tort claims Plaintiff has alleged against Stephens and Reeves are intentional torts (wrongful termination, tortious interference, civil conspiracy, and intentional infliction of emotional distress).  As a result, the common law doctrine of individual governmental immunity articulated in *Ross* and clarified in *Odom* governs.  In the instant case, the only real question is whether Defendants Reeves and Stephens acted in good faith.  It seems clear that for Reeves, setting the salary of her staff was a discretionary function and one that she reasonably believed to be within the scope of her governmental authority.

Plaintiff alleges that a genuine issue of material fact exists as to whether Reeves and Stephens acted in bad faith when they conspired to oust her from her job by drastically lowering her pay.  (Pl.'s Br. 21.)  Furthermore, Plaintiff argues that Defendants carry the burden of establishing that they acted in good faith, and "[a]t a very minimum, this is a fact question for a jury to determine."  (*Id.*)  The Court agrees that Plaintiff has alleged sufficient facts from which a reasonable jury could find that Stephens and Reeves acted in bad faith.  Accordingly, the Court DENIES Defendants' motion for summary judgment with respect to Defendants' argument that Stephens and Reeves are immune from Plaintiff's tort claims as a matter of law.

### E.    Wrongful Termination in Violation of Public Policy

Generally, either party to an "at-will" employment contract may terminate the relationship at any time and for any, or no, reason. *Suchodolski v. Mich. Consolidated Gas Co.*, 412 Mich. 692, 694-695 (1982).  However, "an exception has been recognized to that rule, based on the principle

that some grounds for discharging an employee are so contrary to public policy as to be actionable." *Id.* at 695; *see also Vagts v. Perry Drug Stores, Inc.*, 204 Mich. App. 481, 484 (1994). One way in which a plaintiff can make out a successful claim for wrongful termination as contrary to public policy is "where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment." *Suchodolski*, 412 Mich. at 695. In *Tombetta v. Detroit, T & I R Co.*, the Michigan Court of Appeals held that it was impermissible to discharge an employee for refusing to falsify pollution-control reports. 81 Mich. App. 489, 491 (1978).

A plaintiff can support their claim for wrongful termination by establishing that he/she was constructively discharged for refusing to violate the law. *See Vagts*, 204 Mich. App. at 486. A constructive discharge can be established by demonstrating the defendant deliberately made the plaintiff's working conditions so intolerable that the employee is forced into an involuntary resignation, or that the working environment becomes so difficult or unpleasant that a reasonable person in the plaintiff's shoes would feel compelled to resign. *Id.* at 487 (quoting *Mourad v. Auto. Club Ins. Ass'n*, 186 Mich. App. 715, 721 (1991)); *see also Moore*, 171 F.3d at 1080. Whether plaintiff's working conditions were intolerable, whether a reasonable person would have expected the alleged illegalities to recur, and whether the defendant acted intentionally are generally questions of fact for the jury. *Vagts*, 204 Mich. App. at 487.

In *Vagts*, the plaintiff alleged that she was constructively discharged because she refused to illegally bill vendors. *Id.* at 483. The Michigan Court of Appeals affirmed the trial court's grant of summary judgment for the defendants because the plaintiff's only evidence of her refusal to violate the law was her resignation. *Id.* at 486. The court held that because she used her resignation as proof of *both* a constructive discharge and her refusal to violate the law she "did not give

defendant an opportunity to act appropriately or inappropriately in reaction to her refusal." *Id.*

In this case, a genuine issue of material fact exists as to whether Reeves wrongfully discharged Plaintiff in violation of public policy. First, a jury could determine that Plaintiff was constructively discharged. It is reasonable to view Reeves's decision to cut Plaintiff's pay by forty percent as a deliberate attempt to compel her to resign. *See Coleman v. Club of Kalamazoo, Inc.*, No. 280230, 2009 WL 103680, at *4 (Mich. App. 2009) ("We conclude that a reasonable person in [the plaintiff's] place would feel compelled to resign from her position when, immediately after admitting to her employer she engaged in protected activity under the [Michigan Whistleblower's Act], she learned that her pay would be cut by 30 percent."). Also, Plaintiff testified that when she filed for unemployment, the government concluded that even though she was an appointee, she was entitled to unemployment because it was her employer's fault that she had to resign. (Chambers Dep. 85:9-15.)

A jury could also reasonably infer that the reason Reeves reduced Plaintiff's pay was because of her refusal to submit Stephens's time records to indicate he worked eight hours a week every week, regardless of how much he actually worked. This conclusion could be reasonably inferred from the close temporal proximity between the incident between Plaintiff and Stephens and the constructive discharge, *see Mickey*, 516 F.3d at 525-26, Stephens's comments during the incident and after Plaintiff's pay was reduced (Chambers Dep. 89:10-12; Ratliff Dep. 37:1-6), and the fact that Defendants' purported reason for the pay cut has been sufficiently called into doubt, *see supra* Section III.A.3. Accordingly, the Court DENIES Defendants' motion for summary judgment regarding Plaintiff's wrongful termination claim.

**F.    Tortious Interference with a Business Relationship**

There are two distinct causes of action for tortious interference. *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich. App. 83, 89 (2005). A plaintiff can bring a claim for tortious interference with a contractual relationship, which must be predicated on an enforceable contract, or tortious interference with a business relationship or expectancy. *Id.* at 89-90. In the instant case, Plaintiff has brought a claim under the latter theory – tortious interference with an advantageous business relationship. She alleges that Stephens and Reeves impermissibly interfered with the business relationship she had with the City of Detroit. (Compl. ¶¶ 108-13.)

The elements for interference with a business relationship are (1) the existence of a valid business relationship or expectancy; (2) defendant's knowledge of the relationship; (3) intentional interference by the defendant; and (4) damages resulting from that interference. *Health Call*, 268 Mich. App. at 90. The defendant's interference must be "an act that is per se wrongful" or "a lawful act with malice and that is unjustified in law." *Feaheny v. Caldwell*, 175 Mich. App. 291, 302 (1990), *overruled in part on other grounds*, *Health Call*, 269 Mich. App. at 85-86. Improper conduct is a subset of wrongful acts and includes illegal, unethical, or fraudulent activities. *Id.* at 304. "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Mino v. Clio Sch. Dist.*, 255 Mich. App. 60, 78 (2003) (quoting *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 217 Mich. App. 687, 698-99 (1996)).

A plaintiff can establish a claim for tortious interference with an at-will employment relationship. *Patillo v. Equitable Life Assurance Soc'y*, 199 Mich. App. 450, 457 (1993). Even though the employment relationship is at-will, the plaintiff has an interest in making sure the employer is allowed to exercise its own judgment without the illegal interference or compulsion of

28

third parties.  *Id.*  It is the interference of third parties, not the "fairness" of the employment decision that is actionable.  *Id.*

It is possible to sustain a claim for tortious interference against corporate officers or employees of the employer who was interfered with, however the plaintiff must prove that they stood as third parties to the business relationship at issue.  *Feaheny*, 175 Mich. App. at 305.  To do so, the plaintiff must demonstrate that the defendant employees or officers were acting pursuant to their own motives and interests, as opposed to the service of the employer.  *Id.*

In *Feaheny*, the Michigan Court of Appeals affirmed the trial court's decision to vacate the jury's verdict awarding  the plaintiff damages on his interference claim.  *Id.* at 294.  The plaintiff was a vice-president at Ford, and the defendants were other higher-ranking executives at the company.  *Id.* at 294-95.  The plaintiff and defendants disagreed over a number of policies that were executed when the defendants took over the management of Ford.  The defendants gave the plaintiff poor reviews, denied him merit-based raises, and excluded him from receiving stock bonuses.  *Id.* at 298.  Eventually, the defendants recommended that the plaintiff be fired, and he was.  *Id.* at 298-99.  In affirming the trial court, the court of appeals reasoned that all of the defendants were the plaintiff's superiors whose responsibilities required them to evaluate the plaintiff's performance, and ultimately make recommendations to the board about his future status and compensation.  *Id.* at 305. It went on to state, "it is not the task of the courts or jury to evaluate the business judgment of a corporation's top executives."  *Id.* at 306.

By contrast, in *Patillo*, the Michigan Court of Appeals allowed an employee's interference claim against his supervisor to go to trial because "[a] review of the record indicate[d] that [defendant] may have been motivated by animosity toward plaintiff or a personality conflict when

he used his authority to recommend that plaintiff's employment be terminated." 199 Mich. App. at 457-58. Such evidence included testimony that the defendant threatened to fire the plaintiff the first day he took over as manager, there was "longstanding animosity" between the two, and the fact that the plaintiff had never been considered insubordinate before, which was the proffered reason the defendant gave for why he recommended firing him. *Id.* at 458.

In the instant case, the Court grants Defendants' motion with respect to Defendant Reeves but not Defendant Stephens. Although Plaintiff charges both Reeves and Stephens with interfering with her relationship with the City of Detroit (Compl. ¶¶ 108-13), the record shows that the relationship she had was really with Reeves. Plaintiff was an appointee on Reeves's staff. Although technically she also had a business relationship with the City, Reeves always retained ultimate decision-making authority with respect to her appointees. (Chambers Dep. 12-16.) There are instances where a supervisor can be liable for tortious interference, *see Patillo*, 199 Mich. App. at 457-58, but in those cases the manager recommended to the company that the plaintiff be terminated. *See id.* As a result, Reeves cannot properly be considered a third party to the relationship, and therefore cannot be guilty of interfering with it. *See Feaheny*, 175 Mich. App. at 305.

On the other hand, it seems clear that a genuine issue of material fact exists as to whether Stephens impermissibly interfered with Plaintiff's business relationship with Reeves, and by extension the City. Ratliff testified that Stephens exerted considerable influence over Reeves. (Ratliff Dep. 44:2-8.) The day before Plaintiff's pay was reduced Stephens allegedly exclaimed, "I'm going to have your job and Bill's job. You are both white racists. You're crackers." (Chambers Dep. 89:10-12.) After the pay cut took effect, Stephens also allegedly said "I told you

30

if I didn't get paid, there was going to be some problems, and no white people are going to decide whether I get paid or not." (Ratliff Dep. 37:1-6.) Indeed, if the Court makes all inferences in favor of Plaintiff, as it must, Stephens threatened Plaintiff when he found out he did not get paid as much as he thought he was entitled, the next day her salary was cut by forty percent, and then Stephen seemed to be gloating about how he brought about that change. This conclusion is bolstered by Ratliff's testimony that he believed Stephens tried to undermine his and Plaintiff's employment with Reeves. (Ratliff Dep. 79:2-8.)

Despite the fact that Stephens and Reeves claim they did not discuss lowering Plaintiff's wages, a genuine issue of material fact exists as to whether Stephens impermissibly interfered with Plaintiff's business relationships. Accordingly, the Court DENIES Defendants' motion on this issue with respect to Stephens but GRANTS it with respect to Defendant Reeves.

### G.    Civil Conspiracy

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Feaheny*, 175 Mich. App. at 307. Because a genuine issue of material fact exists as to whether Reeves and Stephens conspired to lower Plaintiff's pay substantially either because she is white or in retaliation for her complaints about Stephens's alleged racial discrimination or for her refusal to fraudulently fill out Stephens and Council's time sheets, the Court DENIES Defendants' motion for summary judgment with respect to Plaintiff's civil conspiracy claim.

### H.    Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress ("IIED"), the plaintiff must prove: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4)

severe emotional distress." *Duran*, 200 Mich. App. at 629-30 (citing *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602 (1985)). "The trial court must determine as a matter of law whether the defendant's conduct was so extreme and outrageous to withstand a motion for summary disposition." *Id.* Liability will only be found when the defendant's conduct is so outrageous and extreme that it goes beyond all bounds of decency and is "to be regarded as atrocious and utterly intolerable in a civilized community." *Mills*, 212 Mich. App. at 91 (citing *Linebaugh v. Sheraton Mich. Corp.*, 198 Mich. App. 335, 342 (1993)). The conduct must make the average member of the community exclaim "Outrageous!" when described to her. *Id.*; *see also Roberts*, 422 Mich. At 603.

In her response, Plaintiff simply argues that "[g]iven the outrageous circumstances surrounding Plaintiff's forced resignation, questions of fact exist on each of these elements for a jury to determine." (Pl.'s Br. 23.) Even taking all of Plaintiff's allegations as true, the Court holds that her IIED claim fails as a matter of law. Regrettable though it may be, having one's pay reduced (even if cut significantly due to racial discrimination) is not sufficiently outrageous to sustain a claim for IIED. Accordingly, the Court GRANTS Defendants' motion for summary judgment on Plaintiff's IIED claim.

## IV.   Conclusion

For the reasons stated above, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. The Court grants Defendants' motion with respect to Plaintiff's intentional infliction of emotional distress and hostile work environment claims. It also grants summary judgment to Defendants City and Council on Plaintiff's wrongful termination claim because they are entitled to governmental immunity. Finally, Defendant Reeves is granted summary judgment regarding Plaintiff's tortious interference claim. In all other respects, however,

Defendants' motion is denied.  Accordingly, the following claims proceed to trial: Plaintiff's federal claims for disparate treatment, retaliation, and violation of her equal protection rights under 18 U.S.C. §§ 1981 and 1983; Plaintiff's state claim for discrimination and retaliation under the ELCRA; Plaintiff's civil conspiracy claim against Defendants Stephens and Reeves; Plaintiff's state tortious interference claim against Defendant Stephens only; and Plaintiff's wrongful termination claim against Defendant Reeves only.

SO ORDERED.


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  March 30, 2011

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on March 30, 2011.


S/Denise Goodine
Case Manager

33